IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

BRISTOL METALS, LLC,
     Plaintiff,

     v.                                  Civil No. 3:20cv203 (DJN)

MESSER, LLC,
     Defendant.

**MEMORANDUM OPINION**

Plaintiff Bristol Metals, LLC ("Plaintiff") brings this action against Messer LLC ("Defendant"), alleging that Defendant breached its contract (the "Product Agreement") with Plaintiff by increasing prices for the gasses that Defendant sold to Plaintiff by more than 2% per year. Plaintiff seeks damages for the overcharges and a declaratory judgment declaring that the Product Agreement limits yearly price increases to 2% and/or allows Plaintiff to terminate the parties' relationship immediately. This matter comes before the Court on the parties' cross Motions for Summary Judgment (ECF Nos. 15, 17), moving the Court to grant summary judgment in favor of each party on their respective interpretations of the Product Agreement and a subsequent addendum to it (the "2008 Addendum" or the "Addendum").

For the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART the Motions for Summary Judgment (ECF Nos. 15, 17). The Court GRANTS Plaintiff's Motion on the issue of whether the Product Agreement limits Defendant's ability to increase gas prices to 2% per year beyond January 24, 2020, but DENIES Plaintiff's Motion to the extent it seeks damages from before January 24, 2020, and a declaration that Plaintiff may terminate the parties' relationship immediately. Likewise, the Court GRANTS Defendant's Motion on the issue that

Plaintiff waived the right to enforce the 2% price-escalation provision before January 24, 2020, but DENIES Defendant's Motion on the issue of whether the 2008 Addendum effected a permanent change to the Product Agreement. In short, the Court finds that Plaintiff may only enforce the 2% price-escalation term as of January 24, 2020.

## I.    BACKGROUND

For purposes of factual background, the Court recites the basic allegations in Plaintiff's Complaint, the parties' agreed Stipulations and the undisputed fact sections of the parties' memoranda. Except as otherwise indicated, the parties do not dispute the facts stated below.

### A.    Factual Allegations

Plaintiff filed its Complaint against Defendant on March 25, 2020. (Compl. (ECF No. 1).) Plaintiff manufactures steel pipe for various industrial uses and sells its products to customers around the world. (Compl. ¶ 1.) In 1998, Defendant's predecessor-in-interest entered into a Product Agreement with Plaintiff's predecessor-in-interest whereby Defendant's predecessor agreed to sell and deliver certain industrial gases to Plaintiff's predecessor at a facility in Munhall, Pennsylvania.[1] (Stip. ¶¶ 1-3 (ECF No. 14).) Relevant here, the Product Agreement contained a price-escalation clause that limited annual price increases to 2%. (Stip. Ex. 1, at 3.) Further, the Product Agreement allowed the parties to negotiate individual price increases by affording Plaintiff the opportunity to solicit a bona fide offer from a third party. (Stip. Ex. 1, at 2.) If Defendant matched the offer, the Product Agreement would extend by another seven years. (Stip. Ex. 1, at 2.) If Defendant did not match the offer, Plaintiff could

---

[1]     The parties agree that each company assumed the rights and obligations under the Product Agreement from their respective predecessors-in-interest. (Stip. ¶¶ 2, 3.) Accordingly, the Court will hereafter refer to the parties simply as "Plaintiff" and "Defendant" without reference to the predecessor companies.

cancel the contract.  (Stip. Ex. 1, at 2.)  By its terms, the Product Agreement contemplated a

continuing relationship that governed the parties' relationship for the next ten years.  (Stip. Ex. 1,

at 1.)  Additionally, the Product Agreement would automatically renew for another ten years

unless terminated by either party with at least twelve months' advance notice.  (Stip. Ex. 1, at 1.)

The Product Agreement would also renew for ten years after the first delivery to the last storage

tank that Defendant installed at the Munhall facility.  (Stip. Ex. 1, at 1.)

        In September 2008, on the eve of the Product Agreement's ten-year renewal, the parties

executed an addendum to the Product Agreement (the "2008 Addendum" or "the Addendum").

(Stip. Ex. 2.)  The 2008 Addendum extended the Product Agreement by five years and set forth a

new price-escalation schedule that allowed Defendant to increase prices by up to 9% in year two

and 8% in years three through five.  (Stip. Ex. 2, at 1.)  The 2008 Addendum says nothing about

price caps beyond year five, nor does it say anything about the Product Agreement's automatic

renewal provisions.  (Stip. Ex. 2, at 1.)  Plaintiff alleges that it first learned of the 2008

Addendum in January 2020.[2]  (Compl. ¶ 19.)  Neither party gave written notice of their intent to

terminate the Product Agreement as of September 1, 2013.  (Stip. ¶ 5.)

        On June 23, 2017, Plaintiff sent Defendant a letter giving Defendant notice of

Plaintiff's intent to terminate the Product Agreement.  (Stip. Ex. 3, at 1.)  Plaintiff apparently

believed that the Product Agreement would expire in September 2018.  (Stip. Ex. 3, at 1.)  On

June 30, 2017, Defendant responded to the letter with a rejection of Plaintiff's notice to

terminate, asserting that the Product Agreement did not expire until December 19, 2023.  (Stip.

Ex. 4, at 1.)  According to Defendant, the Product Agreement had renewed for another ten-year

---

[2]       Plaintiff assumed its rights and obligations under the Product Agreement in March 2017,
when it acquired predecessor-in-interest Marcegaglia, USA, Inc.  (Stip. ¶ 3.)

term on December 19, 2013, when Defendant installed a vertical hydrogen storage tank at the

Munhall facility.  (Stip. Ex. 4, at 1.)  Plaintiff later sent a letter noting its intent to terminate the

Product Agreement upon its expiration on December 19, 2023.  (Stip. Ex. 5, at 1.)

 On January 24, 2020, Plaintiff sent a letter to Defendant advising that Plaintiff recently

learned of the 2008 Addendum.  (Stip. Ex. 7, at 1-2.)  In that letter, Plaintiff staked out its belief

that the Addendum's silence with respect to price escalation after year five meant that the

original 2% price-escalation limit in the Product Agreement took effect after September 2013.

(Stip. Ex. 7, at 1-2.)  Plaintiff now alleges that Defendant has and continues to overcharge

Plaintiff by failing to comply with the 2% price-escalation cap.  (Compl. ¶ 24-26.)  On February

3, 2020, Defendant responded to Plaintiff with its own letter, arguing that Defendant consistently

charged prices in excess of the 2% cap since 2013, and that Plaintiff never complained about the

charges.  (Stip. Ex. 8, at 2.)  The parties do not dispute that Defendant has increased its prices

beyond the 2% cap for each year since 2014, and that Plaintiff paid the invoiced costs each year

without complaint until January 24, 2020.  (Stip. ¶¶ 8, 16, Ex. 9, at 1; Def.s' Mem. in Supp. of

Summ. J. ("Def.s' Mem") (ECF No. 18) at 9, 10.)

 Plaintiff alleges that Defendant breached the Product Agreement by escalating its prices

more than 2% each year since 2017.  (Compl. ¶¶ 33-40.)  Accordingly, Plaintiff brings two

causes of action against Defendant for breach of contract and declaratory judgment, respectively.

(Compl. ¶ 33-48.)  In its request for declaratory judgment, Plaintiff asks the Court to declare that

the 2% price escalation-limit binds Defendant for the remainder of the contract.  (Compl. ¶¶ 42-

48.)  Alternatively, Plaintiff seeks a declaration that the 2008 Addendum expired on September

1, 2013, meaning that the parties have been operating under an at-will relationship since that

time.  (Compl. ¶¶ 42-48.)

**B.    Motions for Summary Judgment**

As mentioned, both parties have moved the Court for summary judgment based on their respective interpretations of the 1998 Product Agreement and its 2008 Addendum.  In support of its Motion, Plaintiff argues that the 2008 Addendum abrogated the Product Agreement's automatic renewal provisions.  (Pl.'s Reply in Supp. of Mot. Summ. J. ("Pl.'s Reply") (ECF No. 21) at 3-5.)    And because the 2008 Addendum expired in 2013, Plaintiff posits that the parties have operated under an at-will relationship since that time.  (Pl.'s Reply at 3-5.)  From there, Plaintiff reasons that because Defendant relied on the Product Agreement's renewal provisions to bind Plaintiff to that contract until December 2023, Defendant ratified the Product Agreement and now must likewise heed its terms (to include the 2% price-escalation provision).  (Pl.'s Reply at 3-5.)

Conversely, Defendant argues that the 2008 Addendum effected a permanent change to the Product Agreement's price-escalation provision.  (Def.'s Mem. at 6.)  According to Defendant, the 2008 Addendum's silence with respect to price escalation beyond year five evinces the parties' intent to operate without price caps beyond that time.  (Def.'s Mem. at 11-15.)  In any event, Defendant contends that the parties' course of performance — namely, Plaintiff's silent acquiescence to the price increases every year after 2013 — confirms that the parties did not intend to impose price caps on Defendant.  (Def.'s Mem. at 16-23.)  On those same grounds, Defendant argues that even if the 2% price-escalation clause applied after 2013, the parties' course of performance either modified the price cap or waived Plaintiff's right to enforce it.  (Def.'s Mem. at 20-22.)

On August 21, 2020, Defendant filed its Opposition to Plaintiff's Motion for Summary Judgment, (Def.'s Opp. to Pl.'s Mot. for Summ. J. ("Def.'s Resp.") (ECF No. 20)), and, on

5

August 31, 2020, Plaintiff filed its Reply (Pl.'s Reply.)  Likewise, on August 21, 2020, Plaintiff

filed its Memorandum in Opposition to Defendant's Motion for Summary Judgment (Pl.'s Opp.

to Def.'s Mot. for Summ. J. ("Pl.'s Resp.") (ECF No. 19)), and, on August 31, 2020, Defendant

filed its Reply Brief in Support of Motion for Summary Judgment (Def.'s Reply Br. in Supp. of

Mot. Summ. J. ("Def.'s Reply") (ECF No. 22)), rendering the matter now ripe for review.

## II.    STANDARD OF REVIEW

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment

should be granted "if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The relevant

inquiry in a summary judgment analysis focuses on "whether the evidence presents a sufficient

disagreement to require submission to a [factfinder] or whether it is so one-sided that one party

must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

In reviewing a motion for summary judgment, the Court must view the facts in the light most

favorable to the non-moving party. *Id.* at 255.  Moreover, the Court cannot weigh the evidence

to enter a judgment, but simply must determine whether a genuine issue for trial exists. *Greater

Balt. Ctr. for Pregnancy Concerns v. Mayor of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013).

Once the moving party properly submits and supports a motion for summary judgment,

the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec.

Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).  The mere existence of some

alleged factual dispute between the parties will not defeat an otherwise properly supported

motion for summary judgment; instead, there must be no genuine issue of material fact.

*Anderson*, 477 U.S. at 247-48.  "Only disputes over facts that might affect the outcome of the

suit under the governing law will properly preclude the entry of summary judgment." *Id.*

To defeat an otherwise properly supported motion for summary judgment, the non-moving party "must rely on more than conclusory allegations, 'mere speculation,' the 'building of one inference upon another,' the 'mere existence of a scintilla of evidence,' or the appearance of some 'metaphysical doubt' concerning a material fact." *Lewis v. City of Va. Beach Sheriff's Office*, 409 F. Supp. 2d 696, 704 (E.D. Va. 2006) (citations omitted). A "genuine" issue concerning a "material" fact only arises when the evidence, viewed in the light most favorable to the non-moving party, allows a reasonable factfinder to return a verdict in that party's favor. *Anderson*, 477 U.S. at 248.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). "When considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." *Id.* (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

If a party fails to address the other party's assertion of fact, the Court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P 56(e)(2). Further, Rule 56 provides that the Court may "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

Under Pennsylvania law, breach-of-contract claims contain three elements: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the

7

contract, and, (3) resultant damages. *Udodi v. Stern*, 438 F. Supp. 3d 293, 299 (E.D. Pa. 2020).

## III.   ANALYSIS

The parties do not dispute the material facts.  Additionally, the parties agree that Pennsylvania law supplies the controlling analysis.[3]  Accordingly, the Court's analysis utilizes principles of contract interpretation — as expounded by courts applying Pennsylvania law — to resolve the instant dispute. *SBA Towers II LLC v. Wireless Holdings, LLC*, 231 A.3d 901, 907 (Pa. Super. Ct. 2020) ("The interpretation of a contract is a matter of law.").

### A.   The Undisputed Facts Show that the 2008 Addendum Did Not Effect a Permanent Change to the Product Agreement's Price-Escalation Provision or Renewal Provision.[4]

The threshold issue that the Court must resolve concerns what effect, if any, the 2008 Addendum had on the original Product Agreement.  Plaintiff contends that the 2008 Addendum only operated for five years.  (Pl.'s Reply at 2-3.)  Further, Plaintiff argues that the Addendum replaced both the renewal provision and the pricing schedule in the Product Agreement.  (Pl.'s Reply at 3.)  Thus, after the expiration of that five years (i.e., in 2013), the parties operated under an at-will relationship.  (Pl.'s reply at 3-4.)  Conversely, Defendant argues that the 2008 Addendum's pricing schedule effected a permanent change to the Product Agreement's price-escalation provision, but did not affect the Product Agreement's renewal provisions.  (Def.'s Mem. at 13-15.)  Hence, at the expiration of the five years, the Product Agreement renewed according to the original renewal provision, but without the original price caps.  (Def.'s Mem. at 13-15.)  The Court finds that both parties only get it half right.

---

[3]      (Pl.'s Mem. at 7; Def.'s Mem. at 11-12, n. 3) (agreeing that Pennsylvania law applies, because the parties executed the contract in Pennsylvania and performance occurred there).

[4]      In light of the Court's ruling on this question, the Court need not address Plaintiff's equitable estoppel argument.

Contract interpretation, as a question of law, requires a court to ascertain and give effect to the parties' intent. *SBA Towers II LLC*, 231 A.3d at 908. To that end, courts give primary consideration to a written contract. *Assalone v. S-L Distribution Co.*, 978 F. Supp. 2d 427, 433 (M.D. Pa. 2013). Indeed, should the court find no ambiguity in the written contract, the court must enforce its plain language as written, "without regard to its wisdom or folly." *SBA Towers II LLC*, 231 A.3d at 908 (citing *Steuart v. McChesney*, 444 A.2d 659, 663 (Pa. 1982)); *see also Regscan, Inc. v. Con-Way Transp. Servs., Inc.*, 875 A.2d 332, 337 (Pa. Super. Ct. 2005) ("When the language of a written contract is clear and unequivocal, its meaning must be determined by its contents alone") (quoting *Greene v. Oliver Realty, Inc.*, 526 A.2d 1192, 1194 (Pa. Super. Ct. 1987)).

Ambiguity arises when the language proves "reasonably susceptible of different constructions and capable of being understood in more than one sense." *SBA Towers II LLC*, 231 A.3d at 908 (quoting *Lenau v. Co-Exprise, Inc.*, 102 A.3d 423, 429-30 (Pa. Super. Ct. 2014)). Importantly, "[m]ere disagreement between the parties on the meaning of language or the proper construction of contract terms does not constitute ambiguity." *Id.* (quoting *Betz v. Erie Ins. Exch.*, 957 A.2d 1244, 1253-54 (Pa. Super. Ct. 2008)). Relevant here, courts generally do not find ambiguity when the parties quarrel over "the absence of language specifying prospective concerns." *Id.* at 909.

First, a textual analysis of the 2008 Addendum reveals that the Addendum replaced the 2% price-escalation cap only during the time period spanning from September 2008 to September 2013. For instance, Paragraph 4 reads:

> Escalations year over year will be as follows and will [be] based off of the prior years base price.
> a. Not to exceed 9% in year 2.
> b. Not to exceed 8% in years 3 . . . 5.

9

(Stip. Ex. 2, at 1.) Paragraph 5 then reads: "In the event of a dramatic increase in market conditions in years 2010 – 2013 (after year 2 of the agreement), [Defendant] will review the price increase structure and negotiate in good faith a fair price adjustment to coincide with market conditions." (Stip. Ex. 2, at 1.) These two paragraphs provide the Addendum's only references to the pricing schedule. And, on their face, only relate to price increases through year 2013. The Addendum makes no mention whatsoever of the Product Agreement's 2% price-escalation clause.

From this silence, Defendant argues that the Addendum reflects the parties' intent to operate without any price-escalation limits after 2013. (Def.'s Resp. at 9.) According to Defendant, the parties "could have renegotiated the price-escalation limit when they renewed the Agreement in 2013. Or they could have included a sunset clause in the 2008 Addendum stating that, if the Agreement were renewed in 2013, the price-escalation limit would revert to the 2% specified in the original Agreement." (Def.'s Resp. at 9-10.) Thus, Defendant maintains, the Addendum's 5-year pricing schedule "effect[ed] a permanent change" in the Product Agreement's terms. (Def.'s Resp. at 9) (citing *Mun. Auth. of Westmoreland Cty. v. CNX Gas Co., LLC*, 380 F. Supp. 3d 464, 470 (W.D. Pa. 2019)). But contractual silence does not do that much work.

In *SBA Towers II LLC*, the appellant ("SBA Towers") executed a lease with the appellee ("Wireless Holdings") to rent an outdoor cellular tower and an indoor shelter that SBA Towers then sub-leased to other companies. *SBA Towers II LLC*, 231 A.3d at 903. Wireless Holdings eventually became concerned with possible theft and equipment damage after various suspicious incidents occurred on the premises. *Id.* As a result, Wireless Holdings imposed new requirements that limited SBA Towers and its tenants' ability to freely access the facility. *Id.* at

10

903-04.  SBA Towers protested the requirements, insisting that it, as well as its tenants, required

24-hour access.  *Id.* at 903.  The relevant contractual language between the parties stated:  "[SBA

Towers] shall have at all times . . . the right of access to and from the Leased Space . . . on a 24

hours per day/7 days per week basis." *Id.*  From that language, Wireless Holdings argued that

nothing in the lease prohibited "reasonable procedures" for access to the property, and that an

ambiguity existed in the language allowing "24/7" access to the property. *Id.* at 905.  The trial

court agreed with Wireless Holdings. *Id.*  Specifically, the trial court found that an ambiguity

existed with respect to the 24/7-access language, because SBA Towers would add the qualifier

"unrestricted" before that language, while Wireless Holdings would add the word "restricted."

*Id.*

      On appellate review, the Superior Court of Pennsylvania reversed and rejected Wireless

Holdings's argument. *Id.* at 906-11.  In particular, the appellate court found that the 24/7-access

language did not suffer from ambiguity. *Id.* at 909-10.  On that front, the court expressly

rejected the notion that the contract's silence afforded the opportunity to add language otherwise

absent from the contract:

> [the 24/7-access language] did not impose any restrictions on [SBA Towers's]
> access to the property and it was silent as to whether Wireless Holdings may, in
> the future, impose any restrictions.  While the trial court interpreted this silence as
> an ambiguity, we conclude that the lack of any restriction, or provision for future
> modification, evinced the parties' intent not to restrict [SBA Towers's] access.

*Id.* at 909.  Indeed, following a careful review of Pennsylvania decisional law, the Superior Court

observed that findings of ambiguity "have generally arisen from the parties' dispute over the

meaning of a term present in the contract, not the absence of language specifying prospective

concerns." *Id.*  This result makes practical sense, as allowing a party to claim ambiguity from

contractual silence — and to thereby depart from the plain language of the contract — "would

allow a party to modify its contractual rights or obligations, or the other party's rights or obligations, by simply arguing that the contract was silent as to whether that alteration was permissible." *Id.* at 910. As such, the appellate court enforced the contract as written (by holding that SBA Towers had 24/7 access to the premises) and refused to deploy contractual silence to broaden or narrow that right of access. *Id.* at 911.

The Court finds the *SBA Towers* reasoning equally applicable here. The 2008 Addendum does not purport to affect the pricing schedule beyond year 2013. Indeed, all of the Addendum's language related to the pricing structure proves cabined to the five years immediately following the Addendum's execution. (Stip. Ex. 2, at 1.) For example, the Addendum's price caps simply state that price escalations will not exceed "9% in year 2" and "8% in years 3 . . . 5." (Stip. Ex. 2, at 1.) Moreover, in the next paragraph, Defendant promises that it will review the price increase structure and negotiate a fair price adjustment "[i]n the event of a dramatic increase in market conditions in years 2010 – 2013." (Stip. Ex. 2, at 1.)

The Addendum makes no reference to price escalation after that time, let alone does it purport to permanently abrogate the Product Agreement's original 2% price-escalation limit. Thus, the parties here do not dispute the "meaning of a term present in the contract," but instead the "absence of language specifying prospective concerns." *SBA Towers II LLC*, 231 A.3d at 909. Specifically, the parties dispute what effect the 2008 Addendum had on the Product Agreement's price-escalation clause beyond 2013. And, as mentioned, the Addendum itself contains no language addressing that question. Where the court in *SBA Towers* found that the absence of language restricting the appellant's access to the premises "evince[ed] the parties' intent not to restrict" access, the Court here finds that the absence of language eliminating the

Product Agreement's 2% price-escalation clause evinces the parties' intent not to eliminate that clause.[5] *Id.*

Because a party can interpret silence to mean whatever serves its own interests, courts have shown reluctance to "allow a party to modify its contractual rights or obligations, or the other party's rights or obligations, by simply arguing that the contract was silent as to whether that alteration was permissible." *SBA Towers II LLC*, 231 A.3d at 910. In arguing that the 2008 Addendum "effect[ed] a permanent change to the [Product Agreement's] terms," Defendant relies heavily on *Mun. Auth. of Westmoreland Cty. v. CNX Gas Co., L.L.C.* (Def.'s Mem. at 13) (citing *Mun. Auth. of Westmoreland Cty.*, 380 F. Supp. 3d at 470. Yet the modification analysis in that case proves inapt to the modification analysis here.

In *Mun. Auth. of Westmoreland Cty.*, the plaintiff-lessor leased 2,255 acres of land to defendants-lessees, who used the land for natural gas production. 380 F. Supp. 3d at 466. Although the lease required defendants to pay royalties to the plaintiffs from the gas production, the lease permitted defendants to deduct certain production costs from the royalties owed. *Id.* at 467. However, defendants had paid the royalties without deducting the production costs for a number of years. *Id.* at 467-68. Eventually, when a new company took over as lessee, that company began deducting production costs from the plaintiff's share of the royalties. *Id.* at 468. Plaintiff sued, alleging that although the lease as written permitted the lessees to deduct

---

[5]    Both parties argue that the relevant contractual language proves unambiguous. (Pl.'s Mem. at 12-13; Def.'s Mem. at 7-11.) Unsurprisingly, both parties argue that the language unambiguously supports their respective positions. (Pl.'s Mem. at 12-13; Def.'s Mem. at 7-11.) In truth, the parties ask the Court to depart from the language's plain meaning insofar as they contend that the 2008 Addendum altered the Product Agreement in ways not specified in the Addendum itself.

production costs from the royalties, the lessees either modified or waived that right by failing to deduct those costs for years. *Id.* at 469.

The court focused its analysis on the doctrine of waiver. *Id.* at 469-473. Indeed, the court's modification discussion proves wholly inapposite here, because that analysis hinged on the absence of consideration (which the parties have not put at issue in the instant case).[6] *Id.* Thus, aside from briefly explicating the law of modification, *Mun. Auth. of Westmoreland Cty.* provides Defendant with no substantive modification analysis on which to hang its hat. However, as discussed below, that court's waiver analysis proves illuminating to the instant case.

Finally, for the same reasons set forth above, the Court finds that the Addendum did not abrogate the Product Agreement's renewal provision. Again, a textual analysis of the Addendum shows that it simply left the renewal provision untouched. For example, although the Addendum only extends the Product Agreement by five years (in contravention of the ten-year renewal period), it does not refer to or purport to override the renewal provision. The Addendum says nothing about whether the parties intended to vitiate that provision. (Stip. Ex. 2, at 1.) Additionally, the Addendum's language reflects the parties' understanding that the Product Agreement continued to operate in the background of their relationship. Notably, Paragraph 2 draws a distinction between the "life of the addendum" and the "life of the agreement." (Stip. Ex. 2, at 1.) Specifically, Paragraph 2 provides that Defendant will charge a $200 per month *maintenance* fee to cover all ancillary tank costs over the "life of the addendum," while also stating that the monthly *facility* fee will cover inspection and recertification of the supply tanks "throughout the life of the agreement." (Stip. Ex. 2, at 1.) And again, Paragraph 5 contemplates

---

[6]     Nor could they, as Pennsylvania law dictates that modification does not require consideration in contracts involving the sale of goods.  13 Pa. Cons. Stat. § 2209(a).

14

renegotiation of the price structure in "years 2010 – 2013" "in the event of a dramatic decrease in market conditions," while Paragraph 6 "anticipates an increase in [Plaintiff's] industrial gas use" "throughout the life of this agreement." (Stip. Ex. 2, at 1.) The immediate juxtaposition of language that governs the parties' relationship during the operation of the Addendum (i.e., from 2008 to 2013) with language that acknowledges the Product Agreement's continued operation beyond that time, clearly demonstrates the parties' intent that the Product Agreement would renew in 2013.

In short, the Court will not rewrite the parties' contract based on the 2008 Addendum's silence with respect to either the pricing schedule or the renewal provision. Instead, the Court will enforce the Addendum's plain language. As such, the Court holds that the Addendum did not eliminate the Product Agreement's 2% price-escalation clause, nor did it eliminate the Product Agreement's automatic renewal provision.

     **B.**     **Course of Performance Shows that Plaintiff Waived Enforcement of the Price Cap Only to the Extent of those Goods that Plaintiff Accepted before January 2020.**

     *1.*     *The Parties' Course of Performance Did Not Modify the Product Agreement.*

Defendant contends that the parties' course of performance modified the Product Agreement such that it no longer contained the price-escalation clause. (Def.'s Mem. at 20-22.) Alternatively, Defendant argues that even if course of performance did not effect a modification, Plaintiff has waived the right to enforce the price caps. (Def.'s Reply at 14.) In response, Plaintiff argues that the parties' course of performance subsequent to 2013 did not modify the Product Agreement's price-escalation clause. (Pl.'s Resp. at 9-12.) Specifically, Plaintiff

contends that any such modification fails for its lack of compliance with the statute of frauds.[7] (Pl.'s Resp. at 9-10.) Further, Plaintiff argues that even if it did waive enforcement of the price caps, Plaintiff remains entitled to retract that waiver. The Court agrees with Plaintiff.

As discussed, the Court has ruled that the 2008 Addendum, by its terms, did not abrogate the price-escalation clause of the Product Agreement. Accordingly, the Court must now determine to what extent, if any, the parties' course of performance subsequent to September 2013 either modified or waived the 2% price cap.

Under Pennsylvania law, a course of performance:

> is a sequence of conduct between the parties to a particular transaction that exists if:
>
> (1) the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and
> (2) the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.

13 Pa. Cons. Stat § 1303(a). Generally, the court must construe the express terms of an agreement and "any applicable course of performance" as consistent with each other "whenever reasonable." § 1303(e). However, when such a construction proves unreasonable, express terms prevail over course of performance. 13 Pa. Cons. Stat § 1303(e)(1). Nonetheless, § 1303(e) — which sets forth the general principle that express terms trump course of performance — contains the following limiting provision: "Except as otherwise provided in subsection (f)." In turn, subsection (f) states: "Subject to section 2209 . . . a course of performance is relevant to show a waiver or modification of any term inconsistent with the course of performance."

---

[7]    Plaintiff also raises arguments based on a no oral modification clause ("NOM clause") and commercial unreasonableness. (Pl.'s Resp. at 9-12.) However, in light of the Court's ruling on the statute of frauds issue, the Court need not address Plaintiff's other arguments.

§ 1303(f). And finally, § 2209 contains the Pennsylvania Uniform Commercial Code ("UCC")
rules governing modification, rescission and waiver. 13 Pa. Cons. Stat. § 2209. Importantly,
§ 2209(c) requires contract modifications to comply with the statute of frauds, assuming the
modified contract otherwise falls within its provisions.

As noted, Plaintiff argues that any modification to the parties' contract must comply with
the statute of frauds. (Pl.'s Resp. at 9-10.) Relying on § 2209, Plaintiff emphasizes that
Defendant "has not produced any writing purporting to be a modification of the terms of the
Product Agreement." (Pl.'s Resp. at 10.) Defendant avers that the parties' partial performance
"takes the present case out of the statute [of frauds]." (Def.'s Reply at 10-11.) In essence,
Defendant argues that the modification remains enforceable, because Plaintiff purchased the
goods notwithstanding the greater-than-2% price increases.

Pennsylvania codified its statute of frauds at 13 Pa. Cons. Stat. § 2201. Relevant here,
§ 2201(c)(3) provides that a contract which does not satisfy the statute remains otherwise
enforceable "with respect to goods for which payment has been made and accepted or which
have been received and accepted." The comments to the UCC elucidate the rather narrow
construction of this exception.[8] For instance, comment 2 states that partial performance can
serve "as a substitute for the required [writing]" "only for the goods which have been accepted or
for which payment has been made and accepted." UCC §2-201, cmt. 2. Indeed, the exception's
underlying rationale rests on the court's ability to readily discern a price for goods that the seller
"actually delivered," or, "if the price has been paid," the goods which the seller must now
deliver. *Id.* As such, the partial payment exception takes the contract outside the statute of

---

[8]    The UCC's statute of frauds and Pennsylvania's statute of frauds share nearly identical
language. *Compare* UCC § 2-201 *with* 13 Pa. Cons. Stat. § 2201.

frauds only inasmuch as the exchange of either goods or money prove the contract's existence as to those items already exchanged. *See Artman v. Int'l Harvester Co.*, 355 F. Supp. 482, 486 (W.D. Pa. 1973) ("past performance has a limited effect and affords the buyer a remedy only 'with respect to goods for which payment has been made and accepted.' That section does not indicate in any way that a delivery of goods shall be construed as binding two parties to a complex on-going franchise relationship.").

Here, the parties have not effectively modified their contract. As explained, the modification must comply with the statute of frauds to effectuate a permanent change to the Product Agreement. Defendant attempts to use the partial payment exception as a vehicle to take the entire contract modification outside the statute of frauds. To that end, Defendant relies on *W.I. Snyder Corp. v. Caracciolo*, 541 A.2d 775, 779 (Pa. Super. Ct. 1998), for the proposition that the partial payment of a contract can take the contract itself outside the statute of frauds. (Def.'s Reply at 11.) The Court finds Defendant's reliance on *W.I. Snyder Corp.* unavailing.

In *W.I. Snyder Corp.*, the parties entered into an oral agreement where the appellant agreed to buy certain equipment from the appellee. 541 A.2d at 776. Appellee indicated that he would sell the equipment "as a package" and agreed to accept loads of scrap as payment. *Id.* The parties further decided that appellant would deliver loads of scrap and other material as a downpayment on the equipment, and, pursuant to the deal, appellant later shipped two loads of scrap to appellee to serve as the partial payment. *Id.* at 776-77. Thereafter, appellant abruptly pulled out of the deal after his son arrived at appellee's warehouse to retrieve the equipment. *Id.* In ruling that the statute of frauds did not defeat appellee's contract claim, the court held that "part payment of an *indivisible* contract takes the entire contract outside the requirements of the Statute of Frauds." *Id.* at 779 (emphasis added).

18

Here, the parties do not have an indivisible contract where they exchange payment for one "package" of goods. Instead, the parties' relationship constitutes a multi-decade supply contract involving numerous interactions as they buy and sell substantial quantities of industrial gasses. The relationship proves segmented by each delivery, and the parties can negotiate each individual price increase. For example, Paragraph 9 of the Product Agreement allows Plaintiff fifteen days to counter a proposed price increase with a bona fide offer from a third party. (Stip. Ex. 1, at 2.) If Defendant matches the third-party price, the Product Agreement then extends for another seven-year term. (Stip. Ex. 1, at 2.) If Defendant fails to match the price, Plaintiff may cancel the contract. (Stip. Ex. 1, at 2.) Given as much, the Court finds that the iterative relationship of the parties here does not resemble the transaction at issue in *W.I. Snyder Corp.* Accordingly, the Court finds that the parties' course of performance did not modify the Product Agreement, because the asserted modification did not comply with the statute of frauds.

### 2.     *The Parties' Course of Performance Shows that Plaintiff Waived Enforcement of the Price Escalation Clause until January 2020.*[9]

Although the statute of frauds prevents a finding of modification, it does not operate the same way with respect to waiver. Indeed, § 2209(d), captioned "Ineffective modification or rescission as waiver," reads: "Although an attempt at modification or rescission does not satisfy the requirements [relating to NOM clauses or modified contracts] it can operate as a waiver." 13 Pa. Cons. Stat. § 2209(d).

While modification "effects a permanent change to the agreement's terms," "waiver is not necessarily permanent." *Mun. Auth. of Westmoreland Cty.*, 380 F. Supp. 3d at 470. Waiver represents the "intentional relinquishment of a known right." *Id.* A party can waive its

---

[9]     In light of the Court's ruling on this question, the Court need not address Defendant's voluntary payment rule argument. (Def.'s Mem. at 18-19.)

contractual right expressly, or it can waive rights impliedly through unequivocal conduct demonstrating an intent to relinquish a known right. *Id.* Critically, "a party may waive a particular right temporarily, but later retract that waiver and demand strict compliance with the provision going forward." *Id.*; 13 Pa. Cons. Stat. § 2209(e) ("A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.").

In *Mun. Auth. of Westmoreland Cty.*, discussed *supra*, the court found that the defendants-lessees had impliedly waived their right to deduct production costs by consistently remitting royalty payments that omitted those costs. *Mun. Auth. of Westmoreland Cty.*, 380 F. Supp. 3d at 470. Simply put, the lessees, by failing to enforce their right to deduct production costs for a number of years, had waived their right to enforce that provision of the contract for the *preceding* years. *Id.* at 470-71. Still, the court made clear that such a waiver did not metamorphose into a permanent modification:

> [W]hat [plaintiff] perceives as a prospective waiver or abandonment claim is, in fact, a modification argument. [Plaintiff] disclaims such an argument, maintaining that lessees' right to deduct post-production costs was not modified but rather omitted in its entirety from the Lease by waiver when the various lessees failed to charge these costs for nearly 10 years. This assertion, however, does not implicate waiver. . . Such allegations imply a permanent alteration or amendment to the Lease terms, which is, by definition, a modification.

*Id.* (internal quotation marks omitted). As mentioned earlier, the court then rejected plaintiff's "prospective waiver" argument, because the modification lacked consideration. *Id.* at 471.[10]

---

[10]   Again, that analysis proves inapposite here, as the Pennsylvania UCC governs the issue of modification.

Here, the parties do not dispute that from 2014 to January 2020, Defendant sold, and Plaintiff purchased (without complaint), industrial gasses with a price tag that far exceeded the 2% price-escalation limit. (Stip. ¶¶ 8, 9; Def.'s Mem. at 8-10.)  Indeed, each year Defendant apprised Plaintiff via formal letters of the price increases. (Def.'s Mem. at 18.)  And, without complaining until January 2020, Plaintiff paid the invoices pursuant to the increased prices. (Stip. ¶¶ 8, 9; Def.'s Mem. at 18-19.)  The Court entertains little doubt that Plaintiff's consistent acceptance of the increased prices constituted the intentional relinquishment of a known right.

Indeed, Plaintiff avers, time and again, that it believed that the parties were operating under the Product Agreement. (Pl.'s Mem. in Supp. of Mot. Summ. J. ("Pl.'s Mem.") (ECF No. 16) at 1-5; Pl.'s Resp. at 12-13.)  And the Product Agreement, as discussed at length, contains a 2% price-escalation provision. (Stip. Ex. 1, at 3.)  Yet, Plaintiff fails to even acknowledge its unreserved payment of Defendant's invoices from 2014 to January 2020.  In truth, Plaintiff can only cast blame on its (unexplained) ignorance of the 2008 Addendum and claim that such ignorance somehow forced Plaintiff to pay whatever prices Defendant charged. (Pl.'s Resp. at 12-13.)  Essentially, Plaintiff argues that, because it operated under the impression that the Product Agreement continued to bind Plaintiff, Plaintiff had no choice but to pay Defendant's asking price. (Pl.'s Resp. at 12-13.)

That argument fails for two reasons.  First, as explained above, the Addendum did not alter the Product Agreement's renewal provision.[11]  And second, even if it did, Plaintiff still believed that the Product Agreement — with its price caps — controlled the parties' relationship during the relevant time.  Thus, Plaintiff believed that it had the right to enforce the Product

---

[11]     As such, Plaintiff indeed remained bound to the contract.

21

Agreement's price-escalation provision. Yet, it chose not to. Accordingly, the Court finds that Plaintiff waived enforcement of the 2% price-escalation provision until January 24, 2020.

Nonetheless, a party who has waived its right to enforce an executory portion of a contract may retract that waiver, absent a showing that such retraction will prove unjust in view of a material change of position by the other side. § 2209(e). On January 24, 2020, Plaintiff effectively retracted its waiver of the 2% price-escalation provision and demanded compliance therewith. (Stip. Ex. 7, at 1-3.) As such, Defendant can only prevent retraction if Defendant can show that it has materially changed its position in reliance on the waiver. § 2209(e). But Defendant makes no such showing.

In fact, Defendant fails to advance the reliance argument. Instead, Defendant essentially makes a prospective waiver argument in contending that "[Defendant's and Plaintiff's] course of performance affirmatively waived any right to enforce the 2% cap." (Def.'s Reply at 14; citing *J.W. Goodliffe & Son v. Odzer*, 423 A.2d 1032, 1035 (Pa. Super. Ct. 1980)). However, that argument constitutes a mere restatement of the modification argument already rejected above. *Mun. Auth. of Westmoreland Cty.*, 380 F. Supp. 3d at 470-71 (construing this same argument of "prospective waiver" as a modification argument).

Additionally, Defendant misplaces its reliance on *J.W. Goodliffe*. There, the parties entered into an agreement similar to the one at issue here. *J.W. Goodliffe & Son*, 423 A.2d at 1032-33. Specifically, the plaintiff supplied industrial gas to defendant and would deliver the gas in reusable cylinders (which remained plaintiff's property). *Id.* The parties' contract contained a paragraph that required the defendant to pay a rental fee for late return of the cylinders. *Id.* At the defendant's request, the parties' deleted that paragraph by drawing two diagonal lines through it before the parties' signed the contract. *Id.* The contract also contained

22

a merger clause and a clause prohibiting oral modification (the "NOM clause"). *Id.* Months later, the plaintiff's manager approached defendant and requested that the parties modify the contract to restore the paragraph that had previously been deleted. *Id.* According to the plaintiff, the defendant orally agreed to the modification. *Id.* The parties' relationship continued for three years, during which time the plaintiff charged, and the defendant paid, the rental fee. *Id.* at 1033-34. When the plaintiff sued on other grounds, the defendant counterclaimed for the rental fees it had paid. *Id.* at 1033. The issue thus turned on whether the oral modification sufficed to revive the paragraph of the contract providing for the rental fees. *Id.* at 1034. The court held that the defendant's having paid the rental fees for three years waived its right to enforce the NOM clause. *Id.* at 1035. In short, the court in *J.W. Goodliffe* held that the defendant waived its right to enforce a contractual provision by not enforcing it for three years; it did not hold that the failure to enforce a contractual provision constituted a permanent waiver of that provision for years to come.

Accordingly, the Court holds that Plaintiff waived its right to enforce the 2% price-escalation limit before January 24, 2020. However, Plaintiff retracted its waiver by virtue of its January 24, 2020, letter. As such, the Product Agreement's 2% price-escalation provision will govern the parties' relationship as of that date.[12]

---

[12]    Plaintiff appears to argue that any finding of waiver would run afoul of the UCC's good faith requirements. (Pl.'s Resp. at 10-11.) This argument proves hard to follow, as the finding of waiver stems from Plaintiff's own election not to enforce the Product Agreement's price caps. Nonetheless, waiver does not implicate the good faith analysis (unlike modification, which does). *See* UCC § 2-209, cmt. 2 (explaining that although a modification does not require consideration under the UCC, the parties must make the modification in good faith).

### C.    The Court has Jurisdiction to Issue a Declaratory Judgment

Plaintiff asks the Court for a declaratory judgment in the form of an order, declaring that

the Product Agreement's price-escalation provision remains in effect and/or that Plaintiff may

terminate the parties' relationship immediately.  (Compl. ¶ 48.)   In response, Defendant claims

that the Court lacks subject-matter jurisdiction over the request, because the parties have no live

case or controversy concerning future price increases.  (Def.'s Mem. at 25-28.)  In short,

Defendant argues that the declaratory judgment claim "seeks a ruling that may turn out to be

irrelevant because it concerns future events that might never come to pass."  (Def.'s Mem. at 27.)

Alternatively, Defendant claims that even if the declaratory judgment claim were justiciable, the

Court should exercise discretion not to entertain it.  (Def.'s Mem. at 28-30.)  The Court agrees

with Plaintiff.

This Court has previously explored the purpose of the federal Declaratory Judgment Act:

> Under the Declaratory Judgment Act, a district court, in "a case of actual
> controversy within its jurisdiction . . . *may* declare the rights and other legal
> relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a)
> (emphasis added).  This Act allows the courts to hear those cases and gives the
> courts discretion in whether to declare the rights of litigants, but it does not
> compel the courts to enter a declaratory judgment — i.e., litigants do not have a
> right to judgment in such cases. *Trustgard Ins. Co. v. Collins*, 942 F.3d 195, 201
> (4th Cir. 2019) (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)).  In
> deciding whether to exercise this discretion, courts look to "the teachings and
> experience of the courts concerning the functions and extent of federal judicial
> power." *Id.*  Courts may look to whether the declaratory relief sought "will help
> in clarifying and settling legal relationships and will terminate and afford relief
> from the uncertainty, insecurity, and controversy driving the suit." *Reyazuddin v.
> Montgomery Cty.*, 754 F. App'x 186, 192 (4th Cir. 2018) (quoting *Aetna Cas. &
> Sur. Co. v. Ind-Com Elec. Co.*, 139 F.3d 419, 423 (4th Cir. 1998)).

*Meekins v. Lakeview Loan Servicing, LLC*, 2019 WL 7340300, at *5 (E.D. Va. Dec. 30, 2019).

The parties clearly dispute whether Plaintiff can terminate their relationship and, if not, whether

Defendant can continue increasing prices without restriction.  Indeed, the litigants have filed

cross motions for summary judgment, each asking this Court to clarify and settle their legal relationship and "afford relief from the uncertainty, insecurity, and controversy driving the suit." *Reyazuddin v. Montgomery Cty.*, 754 F. App'x 186, 192 (4th Cir. 2018) (quoting *Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.*, 139 F.3d 419, 423 (4th Cir. 1998)). Without declaratory relief, the parties would potentially remain deadlocked for the next three years until the contract indisputably came to an end.

With this in mind, the Court finds that Defendant's justiciability argument lacks merit. While Defendant spends the balance of its argument asserting that no price caps exist and that Defendant's consistent overcharging of those caps prove as much, Defendant then turns around and claims it *might* not overcharge for the next three years. (Def.'s Mem. at 27.) Instead of having the Court resolve the dispute now, Defendant suggests that if it overcharges for the gasses again, Plaintiff can then run to the courthouse and litigate the disputed invoice. (Def.'s Mem. at 28-29.) At bottom, Defendant argues that — despite its seven-year history of charging prices above the 2% price-escalation cap — it remains too "conjectural" for the Court to consider the question now. (Def.'s Mem. at 27.) However, a party cannot extinguish Article III jurisdiction by virtue of its groundless assertion that it might not repeat a wrong that it has repeated continuously for seven years. *See Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 189 (2000) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. [I]f it did, the courts would be compelled to leave [t]he defendant . . . free to return to his old ways.") (internal quotation marks and citations omitted).

Accordingly, the Court holds that it has jurisdiction to issue a declaratory judgment. Moreover, for the reasons provided above, the Court will grant in part and deny in part Plaintiff's

request for declaratory judgment.  The Court GRANTS Plaintiff's request to the extent that it

seeks a declaration that the Product Agreement limits any price increases after January 24, 2020,

to 2% per year.  The Court DENIES Plaintiff's request to the extent that it seeks a declaration

that Plaintiff may terminate the parties' relationship immediately.  Because the Court finds that

the Addendum did not abrogate the Product Agreement's renewal term, the Court further

DECLARES that the Product Agreement remains in effect until at least September 2023 (as

neither party terminated the contract before its renewal in September 2013).[13]

> ### D.    The Court Orders the Parties to Provide Supplemental Briefing on Damages

As explained, the Court holds that Plaintiff waived the right to enforce the price-

escalation provision between September 2013 and January 24, 2020.  However, Plaintiff

retracted that waiver as of January 24, 2020.  On the current record, the Court cannot determine

what damages, if any, Plaintiff stands entitled to given that the price-escalation clause will now

come into force as of January 24, 2020.[14]  Thus, the Court hereby ORDERS the parties to

provide supplemental briefing on the extent to which Defendant has charged, and Plaintiff has

paid, for more than a 2% price-increase with respect to gasses purchased and delivered after

January 24, 2020.  The parties shall determine the base prices from the relevant invoices that

most recently preceded Plaintiff's retraction of the waiver.

## IV.    CONCLUSION

For the reasons set forth above, the Court GRANTS IN PART and DENIES IN PART the

Motions for Summary Judgment (ECF Nos. 15, 17).  The Court GRANTS Plaintiff's Motion on

---

[13]    Defendant appears to have abandoned its pre-litigation position that the contract
remained in effect until December 2023.  (Def.'s Mem. at 29; Def.'s Reply at 21.)

[14]    The Court advises the parties that the spreadsheet previously submitted to the Court is
largely indiscernible.  (Stip. Ex. 9).

the issue of whether the Product Agreement limits Defendant's ability to increase gas prices to 2% per year beyond January 24, 2020.  The Court DENIES Plaintiff's Motion to the extent it seeks damages from before January 24, 2020, and a declaration that Plaintiff may terminate the parties' relationship immediately.  Likewise, the Court GRANTS Defendant's Motion on the issue of whether Plaintiff waived the right to enforce the 2% price-escalation provision before January 24, 2020, and DENIES Defendant's Motion to the extent that it alleges that the 2008 Addendum effected a permanent change to the Product Agreement.  The Court further DECLARES that the Product Agreement is scheduled to expire in September 2023.

Finally, the Court hereby ORDERS the parties to provide supplemental briefing on the extent to which Defendant has charged, and Plaintiff has paid, for more than a 2% price-increase with respect to gasses purchased and delivered after January 24, 2020.  The parties shall determine the base prices from the relevant invoices that most recently preceded Plaintiff's retraction of the waiver.

Plaintiff shall have fourteen (14) calendar days from the entry of the accompanying Order (ECF No. 28) to file its position on damages.  Defendant shall then have fourteen (14) calendar days from the date of Plaintiff's filing to respond.  Plaintiff may reply within three (3) calendar

days from the date of Defendant's filing.

An appropriate Order will issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all

counsel of record.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Date:  November 2, 2020